# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| DELPHI PETROLEUM, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) C.A. No. N12C-02-302 FWW |
| v. | ) |
| | ) |
| MAGELLAN TERMINALS | ) |
| HOLDINGS, L.P. | ) |
| | ) |
| **Defendant.** | ) |

Submitted: April 24, 2015
Decided: June 23, 2015

Upon Defendant's Motion to Dismiss
**GRANTED, in part, DENIED, in part.**
Upon Defendant's Motion for Partial Summary Judgment
**GRANTED, in part, DENIED, in part.**
Upon Plaintiff's Motion for Partial Summary Judgment
**DENIED, in part, MOOT, in part.**

## OPINION AND ORDER

Marc S. Casarino, Esquire, White and Williams, LLP, 824 N. Market St., Suite 902, P.O. Box 709, Wilmington, Delaware, 19899-0709; Peter J. Mooney, Esquire (argued), White and Williams, LLP, 1650 Market Street, One Liberty Place, Suite 1800, Philadelphia, Pennsylvania 19103-7395, Attorneys for Plaintiff.

Herbert W. Mondros, Esquire, Margolis Edelstein, 300 Delaware Avenue, Suite 800, Wilmington, Delaware 19801; David E. Keglovits, Esquire (argued) and Erin K. Dailey, Esquire, GableGotwals, 1100 ONEOK Plaza, 100 West Fifth Street, Tulsa, Oklahoma 74103-4217, Attorneys for Defendant.

**WHARTON, J.**

# I.     INTRODUCTION

Before the Court are Magellan's Motion to Dismiss and Motion for Partial Summary Judgment and Delphi's Motion for Partial Summary Judgment with regard to a commercial contract and fraud dispute concerning operations at a marine terminal located at the Port of Wilmington in Delaware ("Terminal"). The parties request that the Court resolve several issues to narrow the scope of the dispute in anticipation of trial. In Magellan's Motion to Dismiss, Magellan seeks dismissal of Counts III, IV and V of the Second Amended Complaint ("SAC"), which all allege fraud. In Magellan's Motion for Partial Summary Judgment, Magellan requests that the Court determine that 1) Delphi cannot produce evidence such that a reasonable trier of fact could find that Magellan breached certain contract provisions; 2) Count II of the SAC for breach of the implied covenant of good faith and fair dealing fails as a matter of law; and 3) Delphi is not entitled to consequential damages as a matter of law. In Delphi's Motion for Partial Summary Judgment, Delphi requests that the Court determine that 1) Magellan owes Delphi $421,603.06 for overbilling of heating charges under the 2005 Agreement; 2) Delphi has no responsibility to Magellan for heating charges under the 2011 Agreement; 3) Magellan breached the 2011 Agreement by denying Delphi the right to deliver product to the terminal by truck; 4) Delphi's responsibility for tank cleaning is limited to removing product and waste that can

be removed by shovel and broom; and 5) Magellan's Amended Counterclaim fails for lack of factual support.

The Court applies Super. Ct. Civ. R. 12(b)(6) to Magellan's Motion to Dismiss and Super. Ct. Civ. R. 56(c) to Magellan's Motion for Partial Summary Judgment and Delphi's Motion for Partial Summary Judgment. Applying the Motion to Dismiss standards, the Court finds that 1) Delphi failed to state a claim for which relief can be granted as to Count III of the SAC; 2) it is premature to determine whether the statute of limitations precludes recovery under Count IV of the SAC; and 3) Delphi has adequately pleaded a cause of action under Count V of the SAC.

Applying Super. Ct. Civ. R. 56(c) to Magellan's Motion for Partial Summary Judgment, the Court finds that 1) no reasonable trier of fact could find that a breach of contract occurred based upon Magellan's conduct alleged in ¶¶8(k),(d),(o) and (a) of the SAC and that factual issues remained as to ¶¶8(p) and (e) of the SAC; 2) Count II of the SAC for breach of the implied covenant of good faith and fair dealing is limited; and 3) the Court cannot find that Delphi is not entitled to consequential damages as a matter of law.

Applying Super. Ct. Civ. R. 56(c) to Delphi's Motion for Partial Summary Judgment, the Court finds that 1) there is a factual dispute regarding whether Magellan owes Delphi $421,603.06 for overbilling of heating charges under the

2005 Agreement; 2) the Court cannot rule as a matter of law that Delphi has no responsibility to Magellan for heating charges under the 2011 Agreement; 3) Magellan did not breach the 2011 Agreement by denying Delphi the right to deliver product to the terminal by truck; 4) the Court cannot grant the relief Delphi requests regarding responsibility for tank cleaning based upon its prayer; and 5) Magellan identified the factual basis of its Amended Counterclaim.

Therefore, Magellan's Motion to Dismiss is **GRANTED**, in part, and **DENIED**, in part; Magellan's Motion for Partial Summary Judgment is **GRANTED**, in part, and **DENIED**, in part; and Delphi's Motion for Partial Summary Judgment is **DENIED**, in part, and **MOOT**, in part.

## II.    PROCEDURAL CONTEXT

Delphi, a Delaware corporation, buys and sells petroleum products. Magellan, a Delaware limited partnership, operates a marine terminal in Wilmington, Delaware ("Terminal") to store and handle petroleum products. Delphi and Magellan executed several contracts through which Magellan agreed to provide Delphi with services at the Terminal and Delphi agreed to pay Magellan certain fees. Delphi and Magellan executed a Terminalling Agreement on September 1, 2005 ("2005 Agreement").[1] Delphi and Magellan entered into a second Terminalling Agreement that was executed by Delphi on May 13, 2011 and

---

[1] SAC, D.I. 165, at Ex. A.

by Magellan on May 16, 2011 ("2011 Agreement").[2] Delphi and Magellan executed the Flush Oil Agreement on March 1, 2007.[3]

On February 29, 2012, Delphi filed a Complaint against Magellan for breach of contract, negligence, conversion and unjust enrichment related to the 2005 and 2011 Agreements.[4] On October 23, 2013, the Court approved the parties' stipulation to file an Amended Complaint.[5] The Amended Complaint contained counts for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, unjust enrichment and fraud.[6] The Court granted Magellan's Motion to Dismiss the Amended Complaint with respect to the conversion, unjust enrichment and fraud counts[7] and the Court denied Delphi's Motion for Reconsideration of the Order.[8] On December 22, 2014, Delphi filed a Motion for Leave to File Second Amended Complaint.[9] On January 16, 2015, both parties filed Motions for Partial Summary Judgment[10] By Order dated January 20, 2015, the Court granted Delphi's Motion for Leave to File Second Amended Complaint, which revived Delphi's fraud claims.[11] On February 2, 2015, Delphi filed the SAC

---

[2] *Id.* at Ex. B.
[3] *Id.* at Ex. C.
[4] *See* Compl., D.I. 1.
[5] *See* Oct. 23, 2013 Order, D.I. 39.
[6] Am. Compl., D.I. 33.
[7] *See* May 2, 2014 Order, D.I. 67.
[8] *See* Aug. 1, 2014 Order, D.I. 99.
[9] D.I. 137.
[10] D.I. 155 (Magellan); D.I. 156 (Delphi).
[11] *See* Jan. 20, 2015 Order, D.I. 164.

alleging breach of contract, breach of the implied covenant of good faith and fair dealing and three claims for fraud.[12] On February 17, 2015, Magellan filed a Motion to Dismiss the three fraud claims in the SAC.[13] The parties appeared before the Court for oral argument on April 24, 2015 on Magellan's Motion to Dismiss, Magellan's Motion for Partial Summary Judgment and Delphi's Motion for Partial Summary Judgment.

### III. STANDARD OF REVIEW

#### A. Super. Ct. Civ. R. 12(b)(6).

Super. Ct. Civ. R. 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." When examining the complaint for purposes of a motion to dismiss, the Court accepts all well-pleaded facts as true[14] and draws all inferences in the light most favorable to the plaintiff.[15] If the Court finds that the "plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint," the motion will be denied.[16]

#### B. Super. Ct. Civ. R. 56(c).

Super. Ct. Civ. R. 56(c) provides that summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is

---

[12] *See generally* SAC.
[13] *See* Def.'s Mot. to Dismiss, D.I. 175.
[14] *Loveman v. Nusmile*, 2009 WL 847655, at *2, (Del. Super. Mar. 31, 2009).
[15] *Savor, Inc. v. FMR Corp.*, 2001 WL 541484, at *1 (Del. Super. Apr. 24, 2001).
[16] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

6

entitled to a judgment as a matter of law." When considering a motion for summary judgment, the Court's function is to examine the record to determine whether genuine issues of material fact exist "but not to decide such issues."[17] The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[18] If the moving party meets its burden, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact to be resolved by the ultimate fact-finder.[19] Summary judgment will be granted if, after viewing the record in the light most favorable to the non-moving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[20] If the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment is inappropriate.[21]

## IV.   MAGELLAN'S MOTION TO DISMISS

In the SAC, Delphi added, *inter alia*, three additional counts alleging fraud: Count III- Fraudulent Concealment of Overbilling of Heating Charges; Count IV –

---

[17] *Merrill v. Crothall-Am., Inc.,* 606 A.2d 96, 99-100 (Del. 1992).
[18] *Moore v. Sizemore,* 405 A.2d 679, 681 (Del. 1979).
[19] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).
[20] *Merrill,* 606 A.2d at 99-100.
[21] *See Cook v. City of Harrington,* 1990 WL 35244, at *3 (Del. Super. Feb. 22, 1990) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

Fraudulent Billing of Tank Cleaning Charges; and Count V – Fraud in the Inducement.[22] Magellan moves to dismiss Delphi's three fraud claims contained in the SAC. Magellan asserts that Counts V and III fail to state a claim upon which relief may be granted pursuant to Super. Ct. Civ. R. 12(b)(6) and that Count IV is barred by the statute of limitations.

### A. Delphi has Sufficiently Pleaded Fraud in Count V of the SAC.

In Count V, the SAC provides that "Magellan emailed Delphi that it 'agreed[d] with your [Delphi's] two changes dealing with improvement costs and truck receipt language'"[23] and that the "statement agreeing to the 'truck receipt language' was a false representation."[24] The SAC also states that "[Tony] Bogle, a key person in the negotiation of the 2011 Agreement and a Magellan employee implicated in the tank heating fraud, admitted that when Magellan said Delphi could deliver oil by truck, Magellan knew that it would not allow Delphi to deliver product by truck."[25] In deposition testimony, Tony Bogle testified: "Q: So you know when you – when this email went out, that if Delphi tried to deliver by truck, Magellan would refuse? A: Yes.[26] The SAC also provides that one week after the 2011 Agreement was executed, "[Tony] Bogle wrote himself a memo detailing the reasons he would give Delphi for denying Delphi the right to deliver to the

---

[22] *See* SAC, at ¶¶ 17-66.
[23] *Id.* at ¶ 50.
[24] *Id.* at ¶ 53.
[25] *Id.* at ¶ 57.
[26] *Id.* (quoting Bogle Dep., Ex. L to SAC at 69:19-22).

8

[Terminal], notwithstanding Magellan had agreed to Delphi's truck receipt language…"[27]

Additionally, the SAC states that "Magellan made its false representation with the intent to induce Delphi to sign the 2011 Agreement,"[28] that "[i]n executing the 2011 Agreement, Delphi justifiably relied on Magellan's statement and the inclusion of the delivery by truck provision into the contract,"[29] and that "Delphi has sustained damages…as a result of Delphi's reliance of Magellan's fraudulent statement and representations."[30]

Magellan argues that Delphi has not made out a *prima facie* claim for fraudulent inducement regarding the Truck Clause because Delphi has not pleaded that it reasonably relied upon extra-contractual representations by Magellan.[31] Magellan asserts that the alleged misrepresentation that Magellan was "in agreement with [Delphi's proposed] changes [to the 2011 Terminalling Agreement] dealing with…truck receipt language" is not a misrepresentation but a matter of interpretation.[32] Magellan also argues that Delphi's "fraud claim is

---

[27] *Id.* at ¶ 58.
[28] *Id.* at ¶ 55.
[29] *Id.* at ¶ 65.
[30] *Id.* at ¶ 66.
[31] Def.'s Mot. to Dismiss at 2.
[32] *Id.* at 2-3.

merely an attempt by Delphi to 'bootstrap' its breach of contract claims into fraud claims.[33]

Delphi argues that it sufficiently pleaded all of the elements of fraud. Delphi asserts that "a claim for fraud can co-exist with a breach of contract claim so long as the fraud claim is based on a promise or misrepresentation collateral or extraneous to the terms of the agreement."[34] Delphi contends that "the May 13, 2011 e-mail chain described in ¶¶48-51 [of the SAC] is indisputably separate from and collateral to the parties' Agreement."[35]

"The general elements of common law fraud under Delaware law are: (1) defendant's false representation, usually of fact, (2) made either with knowledge or belief or with reckless indifference to its falsity, (3) with an intent to induce the plaintiff to act or refrain from acting, (4) the plaintiff's action or inaction resulted from a reasonable reliance on the representation, and (5) reliance damaged the [plaintiff]."[36]

Super. Ct. Civ. R. 9(b) requires a plaintiff to plead fraud with "particularity."[37] "The entire purpose of Rule 9(b) is to put the defendant on notice so that he can adequately prepare a defense."[38] "The 'circumstances' which must

---

[33] *Id.* at 2.
[34] Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss, D.I. 184, at 5.
[35] *Id.*
[36] *Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990).
[37] *Id.*
[38] *Id.*

be stated with particularity under Rule 9(b) refer to 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"[39]

Delphi pleads that "Magellan emailed Delphi that it 'agreed[d] with your [Delphi's] two changes dealing with improvement costs and truck receipt language'"[40] and that the "statement agreeing to the 'truck receipt language' was a false representation."[41] The SAC also pleads that "[Tony] Bogle, a key person in the negotiation of the 2011 Agreement and a Magellan employee implicated in the tank heating fraud, admitted that when Magellan said Delphi could deliver oil by truck, Magellan knew that it would not allow Delphi to deliver product by truck."[42] The SAC alleges that "Magellan made its false representation with the intent to induce Delphi to sign the 2011 Agreement,"[43] that "[i]n executing the 2011 Agreement, Delphi justifiably relied on Magellan's statement and the inclusion of the delivery by truck provision into the contract,"[44] and that "Delphi has sustained damages…as a result of Delphi's reliance on Magellan's fraudulent statement and representations."[45] Delphi has alleged all of the elements of common law fraud

---

[39] *Nutt v. A.C. & S., Inc.*, 466 A.2d 18, 23 (Del. 1983)(quoting *Autrey v. Chemtrust Indus. Corp.*, 362 F. Supp. 1085, 1092 (D. Del. 1973)).

[40] SAC at ¶ 50.

[41] *Id.* at ¶ 53.

[42] *Id.* at ¶ 57.

[43] *Id.* at ¶ 55.

[44] *Id.* at ¶ 65.

[45] *Id.* at ¶ 66.

with particularity.  Therefore, the Court finds that Delphi has adequately made out a *prima facie* case of fraud.

Additionally, the Court finds Magellan's "bootstrapping" argument unpersuasive.  Delaware courts have permitted a claim for fraud and breach of contract claim when the fraud claim is based on a "promise collateral or extraneous to the terms [of] an enforceable agreement in place between the parties."[46]  In *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 555045, Court of Chancery explained that "a plaintiff 'cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations.'"[47]  However, the court acknowledged that

> …statements of future intent can be "fraudulent misrepresentations" sufficient to form the basis of a fraudulent inducement claim only where the Complaint alleges particularized facts that allow the Court to infer that, at the time the promise was made, the speaker had no intention of keeping it. "Indeed, '[s]tatements of intention ... which do not, when made, represent one's true state of mind are misrepresentations known to be such and are fraudulent.[48]

The Court finds that Delphi has sufficiently alleged that Magellan had no intention of allowing delivery by truck to the Terminal at the time the alleged promise to allow delivery by truck to the Terminal was made.  Delphi quotes the

---

[46] *IOTEX Comm'n v. Defries*, 1998 WL 914265, at *5 (Del. Ch. Dec. 21, 1998).
[47] *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 555045, at *17 (Del. Ch. Dec. 30, 2010)(internal citations omitted).
[48] *Id.* at *15 (internal citations omitted).

deposition testimony of Tony Bogle for the proposition that Magellan knew before adding the truck receipt language to the contract that Magellan would not actually allow Delphi to deliver by truck to the terminal; specifically, Delphi alleges that Tony Bogle testified: "Q: So you know when you – when this email went out, that if Delphi tried to deliver by truck, Magellan would refuse?  A: Yes.[49] Additionally, Delphi alleges that Tony Bogle wrote a memo to himself one week after the 2011 Agreement was memorialized that detailed the reasons that he would give to Delphi as to why Magellan would deny Delphi's truck deliveries at the Terminal.[50]  Based upon these allegations, a finder of fact could find that, at the time the promise was made, the speaker had no intention of keeping the alleged promise to allow Delphi to deliver by truck to the Terminal.  Because the Court finds that Delphi has met the pleading requirements under Super. Ct. Civ. R. 12(b)(6) and Super. Ct. Civ. R. 9(b) to state a claim for fraudulent inducement, Magellan's Motion to Dismiss Count V is **DENIED**.

**B.      Delphi has Failed to Plead Fraud in Count III of the SAC.**

As part of its breach of contract claim, in ¶8(u) of the SAC, Delphi alleges that "Magellan overbilled Delphi by at least $580,000 between 2005-11 for the fuel consumed to heat Delphi's oil tanks, and then concealed its overcharges.  Delphi confirmed Magellan's overbilling in December, 2014."  In addition, in Count III,

---

[49] SAC at ¶ 57 (quoting Bogle Dep., Ex. L to SAC at 69:19-22).
[50] *See id.* at ¶ 58.

13

the SAC states, in relevant part, that "Magellan did not reveal the more than $580,000 overbill when it answered, under oath, Interrogatory No. 35 of Delphi's Second Set of Interrogatories and falsely alleged that it had corrected every error in its billings to Delphi."[51] Additionally, the SAC provides that "Magellan knew that it had overcharged Delphi…for heating over the period from 2007 through 2010"[52] and that "Magellan billed Delphi for heating charges on a monthly basis under the 2005 Agreement and Delphi paid all those charges."[53] Paragraph 8(r) of the SAC provides that "Magellan tendered to Delphi inaccurate invoices…and Delphi has paid Magellan sums not actually due by relying on the accuracy of the invoices and is entitled to be refunded all amounts overpaid." Delphi claims damages in excess of $580,000.[54]

Magellan argues that Delphi has failed to state a claim for fraud in Count III of the SAC. Magellan asserts that Delphi's claim fails because Delphi has not alleged that Magellan "made any affirmative representation, or took *any* action, to prevent Delphi from learning that it was being billed for heating oil according to measurements from meters that Delphi claims were erroneous."[55] Magellan also

---

[51] *Id.* at ¶ 33.
[52] *Id.* at ¶ 22.
[53] SAC at ¶ 20.
[54] *Id.* at ¶ 25.
[55] Def.'s Mot. to Dismiss at 4.

asserts that "Delphi does not allege that it took any action, or refrained from taking any action, in reliance on any representation or concealment by Magellan."[56]

Delphi argues that it has properly alleged a claim for fraudulent concealment because pleading fraud is not limited to identifying misrepresentations; fraud may also be pleaded by asserting the defendant deliberately concealed facts or remained silent when faced with a duty to speak.[57] Delphi contends that the SAC sufficiently provides that Magellan "committed fraud by concealing that it overcharged and then kept more than $580,000 of Delphi's money, while at the same time representing to Delphi that 'it had corrected every error in its billings' and demanding that Delphi pay Magellan additional money and interest.[58] Delphi argues that it "acted in reliance on the accuracy of Magellan's 72 detailed monthly heating bills…paid all of them in full and thereby fell victim to Magellan's overbill of $580,000 and subsequent concealment."[59]

The Delaware Supreme Court has held that "[f]raud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts."[60] Here, Delphi alleges that Magellan concealed the overbilling and that Magellan overtly misrepresented that it had corrected every error in its billings

---

[56] *Id.*
[57] Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss at 2.
[58] *Id.*
[59] *Id.*
[60] *Stephenson v. Capano Dev.*, 462 A.2d 1069, 1074 (Del. 1983).

to Delphi.[61]  Delphi also alleges that "Magellan knew that it had overcharged Delphi more than $420,000 for heating over the period from 2007 through 2010."[62] Therefore, Delphi has satisfied the first two elements of the cause of action regarding alleging a false representation and knowledge of the falsity of the representation.

Where Delphi fails in its allegations is in not alleging 1) that Magellan made the false representations with the intent to induce Delphi to take some action or refrain from taking action; or 2) that Delphi took some action in reasonable reliance on the false representations.  Delphi has not pleaded that Magellan intended to induce Delphi to act or refrain from acting based upon the alleged concealment.  Exhibit D to the SAC is the January 21, 2011 letter from Alan Cosby to Tony Bogle, both Magellan representatives, that contains the chart that Delphi relies upon to allege overbilling.[63]  The chart covers the time period from 2007 through 2010.[64]  Based upon that email and chart, at most, Delphi has pleaded that Magellan discovered the alleged overbilling that occurred between 2007 and 2010 on January 21, 2011 and formed the intent to induce on that date.  However, there are no well-pleaded facts in the SAC to support Delphi's assertion that Magellan had the intent to induce Magellan to act or refrain from acting after that date.

---

[61] SAC at ¶ 33.
[62] *Id.* at ¶ 22.
[63] SAC at Ex. D.
[64] SAC at Ex. D.

Delphi must also plead that Delphi took action in reasonable reliance on Magellan's alleged concealment after January 21, 2011. Delphi alleges that "Magellan billed Delphi for heating charges on a monthly basis under the 2005 Agreement and Delphi paid all those charges"[65] and that "Magellan tendered to Delphi inaccurate invoices…and Delphi has paid Magellan sums not actually due by relying on the accuracy of the invoices and is entitled to be refunded all amounts overpaid."[66] However, those assertions address what action Delphi took in response to receiving allegedly inflated invoices but do not address Delphi's actions in response to the alleged concealment of overbilling that occurred after January 21, 2011. Delphi has failed to plead with particularity that it did anything in reliance on Magellan's alleged concealment of the overbilling after January 21, 2011. Instead, Delphi asserts only that Magellan did not unilaterally credit Delphi.[67] The SAC is silent as to Delphi's actions as a result of the alleged concealment.

---

[65] SAC at ¶ 20.
[66] *Id.* at ¶ 8(r).
[67] *See* SAC at ¶¶ 29-32:

> 29. Magellan did not credit Delphi the more than $580,000 overbill when it filed its counterclaims in this litigation.
> 30. Magellan did not credit Delphi the more than $580,000 overbill when accounting for what Delphi allegedly owed.
> 31. Magellan did not credit Delphi the more than $580,000 overbill when claiming Delphi owed more than $300,000 in interest on amounts allegedly owed Magellan.

Similarly, Delphi alleges that the overt misrepresentation that Magellan had corrected all of its billing errors occurred in response to discovery in December 2013.[68] However, Delphi does not allege that Magellan intended to induce Delphi to take any action in response to the overt misrepresentation. Furthermore, Delphi does not allege that Delphi took action in reasonable reliance on the overt misrepresentation.

Because the Court finds that Delphi has not pleaded that Magellan intended to induce Delphi to take some action or refrain from taking action based upon alleged fraudulent statements and that Delphi has not pleaded that Delphi did anything in reasonable reliance upon Magellan's alleged fraudulent statements, Delphi has failed to make out a *prima facie* claim of common law fraud and Magellan's Motion to Dismiss Count III is **GRANTED**.

### C.     Dismissal of Count IV is Premature.

In Count IV, the SAC states that "Magellan fraudulently billed Delphi for tank cleaning charges that were Magellan's responsibility and purposefully altered bills to conceal the fact that it was passing off its charges to Delphi."[69] The SAC also provides that "Magellan overbilled Delphi for the costs relating to the cleaning of tanks leased to Delphi in violation of Clauses 2.7 and 2.8 of Schedule A of the

---

32. Magellan did not credit Delphi the more than $580,000 overbill when it held Delphi's product hostage under an invalid warehouseman's lien…

[68] *Id.* at ¶ 10.
[69] *Id.* at ¶ 36.

2005 Agreement"[70] and that "Magellan breached Clauses 2.7 and 2.8 of Schedule A of the 2005 Agreement by arranging for tank cleaning services to be performed in a manner to minimize the costs of the cleaning for which Magellan was responsible and maximize the costs for which Delphi was responsible."[71]

Magellan argues that Count IV for Fraudulent Billing of Tank Cleaning Charges is barred by the statute of limitations. Magellan asserts that the three-year statute of limitations has run because the underlying invoices that Delphi relies upon to support its claim were issued between 2007 and 2010.[72] Magellan contends that Delphi knew of the invoices in September 2013, if not earlier, when it filed its First Amended Complaint that included a similar allegation.[73]

Delphi argues that the three-year statute of limitations is tolled by the Time of Discovery Rule. Specifically, Delphi asserts that the "concealment and fraud" provision of the Rule applies because Magellan "deceitfully altered cleaning bills."[74] Delphi alternatively claims that the "inherently unknowable and blamelessly ignorant" provision of the Rule applies. Delphi contends that it was "not aware that Magellan was altering its bills, rendering false invoices or colluding with the third party contractor to create fictitious charges" until Magellan

---

[70] *Id.* at ¶ 8(f).
[71] *Id.* at ¶ 8(g).
[72] Def.'s Mot. to Dismiss at 3.
[73] *Id.*
[74] Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss at 3.

19

produced documents during discovery in 2014 and Delphi deposed Magellan witnesses in November and December 2014.[75]

The statute of limitations for claims for fraud is three years under 10 *Del. C.* § 8106.[76] However, the statute of limitations may be tolled by the Time of Discovery Rule under specific circumstances.[77]

> Generally, a cause of action in tort "accrues" at the time the tort is committed.... Ignorance of the cause of action will not toll the statute [of limitations], absent concealment or fraud, or unless the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act.... In the latter circumstance, the statute of limitations begins to run upon the discovery of facts "constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery" of such facts.[78]

---

[75] *Id.* at 4.

[76] *See* 10 *Del. C.* § 8106:

> No action to recover damages for trespass, no action to regain possession of personal chattels, no action to recover damages for the detention of personal chattels, no action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit and credit between parties arising out of contractual or fiduciary relations, no action based on a promise, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action…

[77] *Boerger v. Heim*, 965 A.2d 671, 674 (Del. 2009).

[78] *Id.* (quoting *Coleman v. Pricewaterhousecoopers, LLC*, 854 A.2d 838, 842 (Del. 2004)).

In *Thomas v. Capano Homes Inc.*, 2015 WL 1593618, the Court recently denied a Motion to Dismiss where the parties disagreed as to when the statute of limitations began to accrue. The Court held that

> "[T]he Court will not adjudicate contested issues of fact on a motion to dismiss, nor will it deem a pleading inadequate under Rule 12(b)(6) simply because a defendant presents facts that appear to contradict those plead by the plaintiff." It is premature for the Court to dismiss Plaintiffs' claim as time-barred because, without discovery, it is unclear when the statute of limitations began to accrue, and whether the statue of limitations is tolled by the Time of Discovery Rule.[79]

The parties have engaged in extensive discovery; however, the limited facts contained in the pleadings are unclear as to when the statute of limitations began to accrue and if the Time of Discovery Rule tolls the statute of limitations. In the SAC, Delphi contends that "Magellan fraudulently billed Delphi for tank cleaning charges that were Magellan's responsibility and purposefully altered bills to conceal the fact that it was passing of its charges to Delphi."[80] Additionally, Delphi alleges that "Magellan overbilled Delphi for the costs relating to the cleaning of tanks leased to Delphi in violation of Clauses 2.7 and 2.8 of Schedule A of the 2005 Agreement"[81] and "Magellan breached Clauses 2.7 and 2.8 of Schedule A of the 2005 Agreement by arranging for tank cleaning services to be

---

[79] *Thomas v. Capano Homes Inc.*, 2015 WL 1593618, at *2 (Del. Super. Apr. 2, 2015)(quoting *Doe 30's Mother v. Bradley*, 58 A.3d 429, 445 (Del. Super. Mar. 29, 2012)).
[80] SAC at ¶ 36.
[81] *Id.* at ¶ 8(f).

21

performed in a manner to minimize the costs of the cleaning for which Magellan was responsible and maximize the costs for which Delphi was responsible."[82]

Although Magellan argues that the underlying invoices cover the time period from 2007 through 2010, the pleadings do not establish a timeframe such that the Court can determine if the claim is barred by the statute of limitations. Therefore, Magellan's Motion to Dismiss Count IV is **DENIED**.

### V.    MAGELLAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Magellan's request for summary judgment can be grouped into three parts for purposes of the Court's analysis: there are six arguments involving breach of contract analysis, an argument concerning breach of the implied covenant of good faith and fair dealing and an argument regarding damages.

Magellan's seeks summary judgment on some of Delphi's breach of contract claims on the grounds that: 1) Delphi's claim in ¶8(k) of the SAC that Magellan breached the PSA fails as a matter of law; 2) Delphi cannot produce evidence from which a reasonable trier of fact could find that Magellan breached the 2005 Agreement by failing to account for 1,100 barrels discharged from the vessel Asphalt Victory as alleged in ¶8(d) of the SAC; 3) Delphi cannot produce evidence from which a reasonable trier of fact could find that Magellan's refusal to accept product from the vessel Asphalt Seminole was a breach of the 2005 Agreement as

---

[82] *Id.* at ¶ 8(g).

alleged in ¶8(o) of the SAC; 4) Delphi cannot produce evidence from which a reasonable trier of fact could find that Magellan breached the 2011 Agreement by failing to credit Delphi for product in the Conectiv pipeline as alleged in ¶8(p) of the SAC; 5) Delphi cannot produce evidence from which a reasonable trier of fact could find that Magellan's refusal to allow delivery of fuel by truck to the Terminal constitutes a breach of the 2011 Agreement as alleged in ¶8(e) of the SAC; and 6) Delphi cannot produce evidence from which a reasonable trier of fact could find that Delphi is entitled to recover the alleged loss of 5,000 barrels under the 2005 Agreement as alleged in ¶8(a) of the SAC.

Magellan also seeks summary judgment on Count II of the SAC for breach of the duty of good faith and fair dealing because Magellan argues that Count II fails as a matter of law. Magellan requests summary judgment to enforce Clause 4.2 of Schedule A of the 2005 and 2011 Agreements, the limitation of damages provision, arguing that Delphi is not entitled to consequential damages per the plain terms of the Agreements.

### A. Breach of Contract Claims

Magellan's first six arguments concern subsections of ¶8 of the SAC. The common prayer for relief is that the Court determine that Delphi cannot produce evidence from which a reasonable factfinder could find that Magellan breached various provisions of the Agreements. Although Magellan, in its Opening Brief,

23

frequently frames the issue as a "failure to state a claim," the Court will examine the factual record before it on summary judgment.

To prevail on a claim for breach of contract, a plaintiff must show that a contract existed, that the contract obligation was breached and that Plaintiff suffered damages as a result of the breach.[83] For purposes of summary judgment, Super. Ct. Civ. R. 56(c) "mandates the entry of summary judgment…against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[84] Consequently, if the factual record reveals that Delphi has not made a showing as to an element of a breach of contract claim, the Court will grant summary judgment, but if the factual record supports every element, summary judgment will be denied.

     1.    *The Undisputed Facts Establish that Delphi's Claim Under ¶8(k) of the SAC is Time-Barred.*

In ¶8(k) of the SAC, Delphi alleges that it suffered damages when

> Magellan breached Clause 1.1(c) of a certain September 1, 2005 Purchase and Sale Agreement by failing to negotiate in its new lease with the Diamond State Port Corporation ("Port") a clause reimbursing Delphi for $800,000 of costs incurred by Delphi's subsidiary, Delaware Terminal Company ("DTC") and by failing to notify Delphi, before executing its new agreement with the Port, that such a clause had not been included in the new lease. Delphi would have

---

[83] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005).
[84] *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991).

24

received $400,000 had the clause been included in the new lease. DTC's rights to the reimburse[*sic*] were assigned to Delphi.

Delphi sold the Terminal to Magellan through the execution of a Purchase and Sale Agreement ("PSA") in 2005. Clause 1.1(c) of the PSA provides that

…[Delphi] has a claim under the Dock Lease for Eight Hundred Thousand US Dollars ($800,000) against the [Port]… for reimbursement of costs incurred by [Delphi] in the construction of a mooring structure in or about 2001 (the "Reimbursement Claim"). The Port and [Delphi] entered into a Memorandum of Understanding on October 19, 2001 in which the Port agreed that [Delphi] would be entitled to deduct Eight Hundred Thousand Dollars ($800,000.00) in settlement of the Reimbursement Claim from rental payments that [Delphi] would owe the Port under a [New Dock Lease] agreement…Should the New Dock Lease between the Port and [Delphi] not be finalized prior to the Effective Date [of the PSA], Magellan shall not negotiate with the Port to exclude [the Reimbursement Claim] from any New Dock Lease that [Magellan] may consummate with the Port.[85]

A new dock lease between Delphi and the Port was not finalized prior to the effective date of the PSA. On April 7, 2008, Magellan notified Delphi via letter that "[t]he Port has refused to include the [Reimbursement Claim] language or to provide any alternative settlement proposal concerning the Reimbursement Claim" in the new dock lease between Magellan and the Port.[86] The new dock lease

---

[85] Def.'s Opening Br., D.I. 155, at Ex. 4.
[86] *Id.* at Ex. 8.

25

between Magellan and the Port does not contain the Reimbursement Claim but provides a $36,000 monthly rent reduction to Magellan.[87]

Magellan argues that Delphi's claim in ¶8(k) of the SAC is barred by the statute of limitations because Delphi was notified on April 7, 2008 that the new dock lease between the Port and Magellan did not include the $800,000 credit to Delphi.[88] Magellan claims that Delphi's deadline to file a claim was April 7, 2011 based upon the three-year statute of limitations and that Delphi did not file a claim until February 29, 2012.[89] Magellan also argues that the Memorandum Of Understanding provided that Magellan and the Port would present the proposed $800,000 credit to Delphi to their respective boards of directors for consideration and the undisputed facts are that the Port's board of directors rejected the provision.[90] Magellan alternatively argues that Delphi cannot prove that Magellan breached the PSA by negotiating with the Port to exclude the $800,000 credit or that the Port proposed an alternative settlement that triggered Magellan's duty to notify Delphi of the alternative arrangement.[91] Additionally, Magellan asserts that the parties agreed that if the $800,000 credit was not included in the new dock

---

[87] Pl.'s Answ. Br., D.I. 172, at Ex. 7.
[88] Def.'s Opening Br., at 7.
[89] *Id.*
[90] *Id.* at 8.
[91] *Id.* at 7-8.

lease between Magellan and the Port and no alternative settlement was presented, Delphi's sole remedy is against the Port.[92]

Delphi argues that the Time of Discovery Rule tolls the running of the statute of limitations for the claim where the injury is "inherently unknowable" and the plaintiff is "blamelessly ignorant" or for "concealment or fraud."[93] Delphi claims that it did not know of the terms of the new dock lease until June 2013.[94] Delphi contends that "*Magellan struck a side deal for reduced rent instead of negotiating in good faith to keep the $800,000 reimbursement clause in the agreement on behalf of Delphi as required.*"[95] Delphi claims that the alleged side deal was for a $36,000 per year reduction in rent, that the alleged side deal was concealed from Delphi and that "[i]t is a fair inference that the Port and Magellan agreed to the reduced rent in exchange for Magellan giving up to $800,000 reimbursement clause."[96] Delphi also argues that whether or not the Port's board's approval of the $800,000 credit was required and whether or not the Port's board rejected the $800,000 credit provision are questions of fact that cannot be answered merely by "self-serving affidavits alone" produced by Magellan.[97]

---

[92] *Id.* at 8.
[93] Pl.'s Answ. Br., at 9.
[94] *Id.*
[95] *Id.* at 3 (Italics in original).
[96] *Id.* at 6.
[97] *Id.* at 7-8.

The statute of limitations for breach of contract claims under 10 *Del. C.* § 8106 is three years.[98] Generally, the statute begins to run when the injury occurs or, stated differently, when the contract has been breached.[99] The Court applies the Time of Discovery Rule to breach of contract claims for situations where the injury is "inherently unknowable" and the plaintiff is "blamelessly ignorant."[100] However, "actual discovery [of the injury] commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the [plaintiff] no longer blameless."[101]

Delphi asserts that it could not have known that the Reimbursement Claim was not included in the New Dock Lease because Magellan refused to give Delphi a copy of the New Dock Lease "until Magellan's June 2013 document production."[102] However, the record reflects that on April 7, 2008, Magellan notified Delphi via letter that "[t]he Port has refused to include the [Reimbursement Claim] language or to provide any alternative settlement proposal concerning the Reimbursement Claim."[103] Therefore, Delphi "actually discovered" that the Reimbursement Claim was not included in the New Dock Lease on April 7, 2008. At that point, Delphi was on notice of a possible breach of

---

[98] *See supra* note 76.

[99] *Ruger v. Funk*, 1996 WL 110072, at *2 (Del. Super. Jan. 22, 1996).

[100] *Id.*; *see also Marcucilli v. Boardwalk Builders, Inc.*, 2002 WL 1038818, at *4 (Del. Super. May 16, 2002)("The time of discovery rule applies to breach of contract claims.").

[101] *Ruger*, 1996 WL at *2.

[102] Pl.'s Answ. Br., at 7.

[103] Def.'s Opening Br., at Ex. 8.

contract action and had a duty to investigate. Instead, Delphi did nothing until February 29, 2012 when it initiated this lawsuit.

Delphi's argument that Magellan negotiated a "side deal" with the Port to obtain reduced rent and concealed the "side deal" from Delphi may have been sufficient to toll the statute of limitations if Delphi had presented any facts to establish that the alleged "side deal" exists. Instead, Delphi merely argues that the fact that Magellan received a $36,000 monthly rent reduction in the New Dock Lease combined with the fact that the New Dock Lease excluded the Reimbursement Claim creates "a fair inference that the Port and Magellan agreed to the reduced the [*sic*] rent in exchange for Magellan giving up the $800,000 reimbursement clause."[104] The Court cannot find that Delphi's bald assertions regarding the alleged "side deal" create a genuine dispute of material fact. Therefore, the Court finds that a claim for breach of contract based upon ¶8(k) of the SAC is time-barred. Consequently, the Court need not address the parties' additional arguments. Magellan's Motion for Partial Summary Judgment is **GRANTED**.

> 2. *The Undisputed Facts Show that Delphi Suffered No Damages as a Result of the Conduct Alleged in ¶8(d) of the SAC.*

In ¶8(d) of the SAC, Delphi alleges that Delphi suffered damages when

---

[104] Pl.'s Answ. Br., at 6.

> Magellan failed to properly perform the services it was obligated to perform under the 2005 Agreement and failed to properly control the discharge of, and accurately gauge the quantity discharged from, the vessel "Asphalt Victory" in December 2010. These failures resulted in the quantity of the discharge from this vessel to be overstated by more than 1,100 barrels.

Delphi concedes that Kildair, the entity from which Delphi purchased oil in December 2010, has not yet billed Delphi for the $90,000 Delphi contractually owes Kildair but asserts that Kildair may bill Delphi before 2016 based upon the statute of limitations that governs that contract.[105] A bill of lading indicates that Magellan received 166,024 barrels of product at the Terminal on behalf of Delphi for the December 2010 delivery.[106]

Magellan argues that Delphi cannot recover under ¶8(d) of the SAC for breach of contract because Delphi has suffered no damages.[107] Magellan asserts that Delphi concedes that it did not pay for the alleged overstatement of barrels discharged from the Asphalt Victory in December 2010 but that Delphi merely has a "risk of paying the ship for the 1,100 barrels."[108] Magellan argues that such speculative damages are insufficient to survive a motion for summary judgment.[109]

---

[105] *Id.* at 13.
[106] *See id.,* at Ex. 11.
[107] Def.'s Opening Br., at 10.
[108] *Id.*
[109] *Id.* at 11.

Delphi argues that it has suffered damages as a result of the alleged overstatement of barrels discharged to the Asphalt Victory.[110] Delphi admits that "Kildair has not yet billed Delphi for the additional $90,000 but…Kildair has until the end of 2016 to bring a claim [against Delphi]."[111] However, Delphi argues that it has already suffered damages in the amount of $26,147.25.[112] Delphi asserts that its contract with Kildair specifies that Delphi pays only for the actual quantity of barrels Delphi receives, which registered at 166,024 barrels for the December 2010 delivery.[113] Delphi contends that Delphi should have only paid Kildair for 164,637 barrels because Magellan determined a month or more after the delivery that the quantity of barrels received by Delphi was overstated by 1,387 barrels because of an issue with the pipeline.[114] Delphi asserts that, as a result of Magellan's failure to accurately gauge the quantity of barrels Delphi received in December 2010, Delphi paid Kildair for the quantity of barrels listed on the Bill of Lading which was 166,024.[115] Delphi asserts that the difference between the Bill of Lading amount and the amount Delphi should have paid results in Delphi's overpayment to Kildair for $26,147.25.[116]

---

[110] Pl.'s Answ. Br., at 13.
[111] *Id.*
[112] *Id.*
[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] *Id.* at 14.

When the factual record reveals that plaintiff has suffered no damages as a result of an alleged breach of contract, summary judgment is appropriate.[117] Plaintiff's damages must be actual and cannot be "merely speculative or conjectural."[118] The Delaware Court of Chancery has held that damages based on possible future liability are merely speculative.[119] This Court agrees.

For purposes of this Motion, the Court must bifurcate Delphi's claim for damages and examine separately the $90,000 portion not yet paid to Kildair and the $26,147.25 portion allegedly paid to Kildair. First, as to the $90,000, Delphi concedes that Kildair has not yet billed Delphi in that amount but asserts that Kildair may bill Delphi before 2016 based upon the statute of limitations controlling that contract. However, the Court would merely be speculating as to Kildair's actions regarding its decision to pursue that claim against Delphi. Therefore, the Court cannot find that there is evidence that Delphi has incurred that portion of the damages.

Second, as to the alleged $26,147.25 that Delphi paid to Kildair, no evidence is before the Court to conclude that Delphi actually paid that amount. The only fact Delphi presented to the Court is a bill of lading that indicated that Magellan received 166,024 barrels of product at the Terminal on behalf of Delphi on the date

---

[117] *Burkhart*, 602 A.2d at 59.
[118] *Laskowski v. Wallis*, 205 A.2d 825, 826 (Del. 1964).
[119] *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009)(holding that potential future liability for income taxes that have not been incurred is "speculative harm").

in question.[120]  There is no evidence such as a wire transfer, receipt or check showing that Delphi actually paid Kildair any amount of money for the quantity of barrels listed on the bill of lading.  Delphi instead relies upon its own bare assertions contained in its Response Brief which are insufficient to create a factual dispute.[121]  Therefore, there are no facts from which the Court can find that Delphi suffered damages as a result of a breach of contract and Magellan's Motion for Partial Summary Judgment as to ¶8(d) of the SAC is **GRANTED.**

3.      *The Undisputed Facts Establish that Magellan did not Breach Clause 2.2 of Schedule A of the 2005 Agreement.*

In ¶8(o) of the SAC, Delphi alleges that Delphi suffered damages when

> Magellan breached the 2005 Agreement by refusing to allow the discharge of the vessel "Asphalt Seminole" in February 2010 even though the product met, and Delphi had in addition prearranged to have the product professionally treated at Delphi's expense to further guarantee that the product would meet, the quality requirements detailed in Clause 2.2 of the 2005 Agreement, resulting in the incurrence of demurrage and additional freight charges.

Clause 2.2 of Schedule A of the parties' 2005 Agreement provides that

> [i]f Magellan receives non-conforming Product: (a) Customer will bear the cost of any additional services required, in the reasonable opinion of Magellan, to receive, deliver, store, handle or blend the non-conforming Product; (b) Magellan may halt delivery at any time, including during the course of delivery, and refuse to continue to receive non-

---

[120]*See* Pl.'s Answ. Br., at Ex. 11.

[121] *See Balzereit v. Hocker's Superthrift, Inc*., 2012 WL 3550495 at *1 (Del. Super. Jul. 24, 2012)("Merely bare assertions or conclusory allegations do not create a genuine issue of material fact.").

conforming Product; and (c) Magellan may require Customer to remove any non-conforming Product received at the Terminal within thirty (30) days of delivery of the non-conforming Product.

The 2005 Agreement specifies the following quality limitations on product being delivered to the Terminal:

| Specification | Limitation |
|---|---|
| Maximum Product Deliver Temperature | 150º F |
| Minimum Heavy Oil Delivery Temperature: | 30º F above Pour Point |
| Maximum Product Viscosity: | 500SSF at 122º F |
| Maximum Product Pour Point: | 90º F |
| Maximum Hydrogen Sulfide (H2S) Content in Liquid Phase of Product: | 2 PPM |
| Maximum Hydrogen Sulfide (H2S) Content in Vapor Space: | 100 PPM in any one tank of delivery vessel and 50 PPM volumetrically correct weighted average in the vapor space of all tanks of delivery vessel |

A "Certificate of Analysis" contains a laboratory certification that the "Vessel Composite" level of H2S measured 200 parts per million for the February 2010 delivery from the Asphalt Seminole.[122]  A "Hydrogen Sulfide Monitoring Report" for the February 2010 delivery from the Asphalt Seminole showed that temperature readings taken at various locations on the vessel all indicated that the product temperature exceeded 150º F.[123]  Counsel for Delphi acknowledged that the "Certificate of Analysis" indicated that the H2S levels exceeded the contract

---

[122] *See* Def.'s Opening Br., at Ex. 14.
[123] *See id.*, at Ex. 17.

specifications but presented the Court with a conflicting report that showed that the H2S levels complied with the contract specifications.[124] Counsel for Delphi also conceded that the reports measuring the product temperature showed that the temperature exceeded 150º F.[125]

Magellan seeks summary judgment on ¶8(o) of the SAC because Magellan argues that it had the right to reject non-conforming product under the 2005 Agreement.[126] Magellan asserts that the 2005 Agreement provides that Magellan may reject nonconforming product for delivery and further defines nonconforming product as having H2S levels in the vapor space of the vessel's cargo that exceed 100 parts per million in any one tank of delivery vessel.[127] Magellan contends that it rightfully rejected delivery from the Asphalt Seminole when the H2S levels in the vapor space of the Asphalt Seminole were reported to range between 100 parts

---

[124] *See* Tr., D.I. 193, at 71: 6-7.
[125] *See* Tr. at 71:22-72:7 which provides:

> THE COURT: Where it reports H2S readings of port, starboard and center of the vessel and it says "add," and then there is a number after that, which appears to be a temperature…
>
> MR. MOONEY: Yes, sir.
>
> THE COURT: And those temperatures are all over 150 degrees?
>
> MR. MOONEY: Those temperatures are by one or two degrees over, 152 degrees.

[126] Def.'s Opening Br., at 12.
[127] *Id.* at 11.

per million and 200 parts per million.[128]  Additionally, Magellan asserts that the report showed that the product temperature exceeded the maximum specified in the 2005 Agreement which gave Magellan an additional basis upon which to reject the delivery.[129]

Delphi argues that Magellan wrongfully rejected the delivery from the Asphalt Seminole because the product met the specifications contained in the 2005 Agreement.[130]  Delphi asserts that the on board inspection of the vessel "showed that the product on board the Asphalt Seminole fully complied with the limitations contained in the 2005 Agreement" but acknowledges that another test conducted at the inspector's laboratory showed that the vapor concentration was higher than what the contract permitted.[131]  Delphi asserts that it was not obligated to report the results of the second test to Magellan but did so to inform Magellan that it had arranged for a third-party to treat the product at the dock to "assure that the product would have an H2S concentration in the vapor phase of zero when stored in Magellan's Terminal."[132]  Delphi also asserts that Magellan's rejection was never justified because "there was a policy in existence in October 2010 that a vessel could deliver product with 100 ppm H2S in vapor or 20 ppm in liquid, but it had to

---

[128] *Id.*
[129] *Id.*
[130] Pl.'s Answ. Br., at 15-16.
[131] *Id.* at 16.
[132] *Id.* at 17.

be treated" and that Magellan had previously used the same third-party treatment firm that was to treat the Asphalt Seminole.[133]

Where there are no facts to support Delphi's contention that Magellan breached the 2005 Agreement by wrongfully rejecting the February 2010 product delivery to the Terminal by the Asphalt Seminole, summary judgment is appropriate.[134] Magellan presented a "Certificate of Analysis" in which the level of H2S measured 200 parts per million for the February 2010 delivery from the Asphalt Seminole.[135] Additionally, Magellan presented a "Hydrogen Sulfide Monitoring Report" for the February 2010 delivery from the Asphalt Seminole that showed that temperature readings taken at various locations on the vessel all indicated that the product temperature exceeded 150º F.[136] At oral argument, Counsel for Delphi acknowledged that the "Certificate of Analysis" indicated that the H2S levels exceeded the contract specifications but presented the Court with a conflicting report that showed that the H2S levels complied with the contract specifications.[137] However, Counsel for Delphi also conceded that the reports measuring the product temperature showed that the temperature exceeded 150ºF.[138]

---

[133] *Id.*
[134] *Burkhart*, 602 A.2d at 59.
[135] *See* Def.'s Opening Br., at Ex. 14.
[136] *See id.*, at Ex. 17.
[137] *See* Tr. at 71: 6-7.
[138] *See supra* note 125.

Based upon the facts in the record, the Court finds that it is undisputed that the product delivered to the Terminal by the Asphalt Seminole in February 2010 was non-conforming product because the temperature exceeded the contractual limitations. Therefore, the Court finds that the undisputed facts show that Magellan did not breach Clause 2.2 of Schedule A of the 2005 Agreement when it rejected the delivery from the Asphalt Seminole in February 2010. Delphi cannot recover under ¶8(o) of the SAC and Magellan's Motion for Partial Summary Judgment is **GRANTED**.

4.      *The Facts Pertaining to ¶8(p) of the SAC are Disputed.*

A ten-inch pipeline runs between the Terminal and a power plant that was owned by Conectiv at the time of the allegation contained in ¶8(p) of the SAC. For various reasons, Magellan determined that the pipeline needed to be purged and discovered that the pipeline still contained some product. Magellan did not know whether the product belonged to Delphi before it searched its records. Magellan discovered a document titled "Delaware Terminal Company Hourly Rate Sheet," dated "12/17/04" and states "T[ank]-12 to Conective [*sic*]" in the top left corner.[139] Karen Peterson, a Delphi representative, testified[140] in response to the question "Do you know whether that product [in the pipeline] belonged to Delphi?" that

---

[139] Def.'s Opening Br., at Ex. 20.
[140] Relevant excerpts of the deposition can be found in Def.'s Opening Br., at Ex. 16.

"[she] believe[d] at that time it belonged to Conectiv."[141] Based upon this information, Magellan transferred the product to Conectiv.

In excerpts from email communications between Magellan representatives, Paul Hafner indicated that "[the product] belongs to [Conectiv]" while Tony Bogle indicated that "[a coworker] asked about Delphi's product in the 10" [Conectiv] line" and Mark Roles stated that "[i]t might be Delphi's product."[142] Additionally, Alan Cosby's June 11, 2009 email summarizing a meeting with Delphi indicates that Magellan contacted Delphi about purging the pipeline and noted that "Delphi loses the rights to the DOT 10" line in Sept 2010" and that "staff remembers this product belonging to Conectiv not Delphi."[143]

Paragraph 8(p) of the SAC alleges that "Magellan breached the 2005 Agreement by failing to properly credit Delphi for approximately 2,000 barrels of No. 2 oil in the pipeline to Conectiv's power plant in Edgemoor, Delaware."

Magellan argues that Delphi's claims under ¶8(p) of the SAC fails as a matter of law because Conectiv, and not Delphi, owned the pipe when the alleged transfer happened.[144] Magellan asserts that in 2010, when Magellan needed to treat a ten-inch pipeline at the terminal, it discovered product still contained in the

---

[141] Peterson Dep. at 186: 19-22.
[142] Pl.'s Answ. Br., at Ex. 14.
[143] *Id.* at Ex. 15.
[144] Def.'s Opening Br., at 13.

39

pipeline.[145] Magellan claims that it searched its records and determined that the product contained in the pipeline belonged to Conectiv so Magellan transferred the product to Conectiv.[146] Magellan asserts that it "discovered a transfer order showing that the product in the line had been transferred to Conectiv" and that "Delphi representative Karen Peterson admitted that the product belonged to Conectiv at the time of the transfer."[147]

Delphi argues that there is a genuine issue of material fact in dispute. Specifically, Delphi contends that ownership of the pipeline is disputed for purposes of this Motion.[148] Delphi asserts that Magellan misconstrues the "transfer order" and contends that the document does not establish that Conectiv owned the product in the pipeline but rather covered testing of the pipeline.[149] Additionally, Delphi contends that email communications between Magellan representatives establish that the product in the pipeline belonged to Delphi at the time of the transfer.[150]

---

[145] *Id.*

[146] *Id.* at 13-14.

[147] *Id.* at 13.

[148] Pl.'s Answ. Br., at 18-19.

[149] *Id*. at 19.

[150] *See* Pl.'s Answ. Br., at 18 ("Bogle responded that '[t]here may be a potential issue…when I met with Ron [Gumbaz] last week …he asked about Delphi's product in the 10" Delmarva [Conectiv] line.'"; "Bogle's supervisor further commented: 'It might be Delphi's product.'"; "Alan Cosby, Magellan's Wilmington area supervisor, also admitted to having been informed by Domenic DiPiero, Delphi's President, that the product was owned by Delphi.")(internal citations omitted).

Where a genuine dispute of material facts exists, summary judgment is not appropriate.[151]  If Magellan meets its burden on summary judgment, Delphi must show that there are material issues of fact in dispute.[152]  It is not enough for Delphi to assert the existence of a disputed fact.[153]  The alleged disputed fact must be one which affects the outcome of the case.[154]

Magellan relies on the document, titled "Delaware Terminal Company Hourly Rate Sheet," for the proposition that it represents a transfer of ownership of product from Delphi to Conectiv because the document states "T[ank]-12 to Conective [*sic*]."  Additionally, Karen Peterson, a Delphi representative, testified in response to the question "Do you know whether that product belonged to Delphi?" that "[she] believe[d] at that time it belonged to Conectiv."[155]  Therefore, Magellan has presented factual information to establish that Conectiv, and not Delphi, owned the product in the pipeline at the time of the transfer.  Therefore, the burden shifts to Delphi to show the existence of a material factual dispute.

Delphi identifies facts that show that the product contained in the pipeline belonged to Delphi at the time of the transfer.  Excerpts from email communications between Magellan representatives illustrate the dispute:  Paul Hafner indicated that "[the product] belongs to [Conectiv]" while Tony Bogle

---

[151] Super. Ct. Civ. R. 56(c).
[152] *Brzoska*, 668 A.2d at 1364.
[153] *Id.*
[154] *Id.*
[155] Peterson Dep. at 186: 19-22.

indicated that "[a coworker] asked about Delphi's product in the 10" [Conectiv] line" and Mark Roles stated that "[i]t might be Delphi's product."[156] Additionally, Alan Cosby's June 11, 2009 email summarizing a meeting with Delphi indicates that Magellan contacted Delphi about purging the pipeline and noted that "Delphi loses the rights to the DOT 10" line in Sept 2010" and that "staff remembers this product belonging to Conectiv not Delphi."[157]

Based upon the factual record, the Court finds that a genuine issue of material fact exists because whether Delphi owned the product contained in the 10" pipeline at the time of the transfer alleged in ¶8(p) of the SAC would affect the outcome of the claim. Therefore, summary judgment is not appropriate and Magellan's Motion is **DENIED**.

5.    *The Undisputed Facts Show that Delphi is Not Entitled to Relief for Breach of Contract as Alleged in ¶8(a) of the SAC.*

In ¶8(a) of the SAC, Delphi alleges, in part, that

> [i]n January 2012 Magellan refused to allow Delphi to deliver No. 6 oil to the Terminal by truck resulting in Delphi losing the supply of approximately 26,000 barrels of No. 6 oil. In May 2012, Magellan again refused to allow Delphi to deliver No. 6 oil to the Terminal by truck, and Delphi consequently lost the supply of 24,000 barrels of No. 6 oil. These refusals constituted breaches of Clause 2.1(a) of Schedule A of the 2011 Agreement…

---

[156] Pl.'s Answ. Br., at Ex. 14.

[157] *Id.* at Ex. 15.

During the negotiation phase of the 2011 Agreement, on May 13, 2011, Delphi proposed the language contained in Clause 2.1(a) of Schedule A of the 2011 Agreement in an email to Magellan.[158] The email stated: "[p]lease see revised draft. Delphi had the right to, and did, deliver to the terminal by truck in the original agreement and needs that in this agreement…"[159] On the same day, Magellan responded to Delphi's proposal via email that it "[a]greed with [Delphi's] two changes dealing with improvement costs and truck receipt language."[160] Delphi executed the 2011 Agreement that day.[161]

Clause 2.1(a) of Schedule A of the 2011 Agreement provides that

> [r]eceipt and deliveries of Product from the Terminal via truck will be made to a Carrier in accordance with the Terminal's operating procedures and in accordance with this Schedule A, Section 2.4…

Clause 2.4 of Schedule A of the 2011 Agreement provides various Terminal operating guidelines. Clause 2.4 provides that "Customer may request the ability to load trucks with Heavy Oil at the Terminal…"[162] Clause 2.9 of Schedule A of the 2011 Agreement provides that "Magellan will maintain two

---

[158] SAC at Ex. J.
[159] *Id.*
[160] *Id.* at Ex. K.
[161] *Id.* at ¶4.
[162] Clause 2.4 of Schedule A of the 2011 Terminalling Agreement.

(2) positions for the loading of Heavy Oil from tanks 3,4,8,17 and 18…".[163]

Additionally, Clause 4.1(b) of Schedule A of the 2011 Agreement provides that

> If Customer is unable to load Heavy Oil at the Back [Truck] Rack…If Customer is unable to load Heavy Oil at a single (1) position of the Back [Truck] Rack…If Customer is unable to load Heavy Oil at the slower of the two truck loading positions at the Back [Truck] Rack….[164]

Magellan argues that, as a matter of law, the language contained in Clause 2.1(a) of Schedule A of the 2011 Agreement does not give Delphi the right to deliver products by truck to the Terminal.[165] Magellan asserts that the 2011 Agreement provides that

> …'[r]eceipt and deliveries of Product *from the Terminal* via truck will be made *to a Carrier* in accordance with the Terminal's operating procedures and in accordance with this Schedule A, § 2.4....' (Ex. 1 at Schedule A, § 2.1(a) (emphasis added).) Section 2.4, in turn, contains no provisions regarding the unloading of trucks at the Terminal, and instead addresses only the loading of product onto trucks for delivery from the Terminal, as contemplated in § 2.1.[166]

Magellan further asserts that parol evidence shows that the Terminal was not equipped to handle deliveries to the Terminal by truck.[167] Magellan contends that "Magellan proposed an Amendment to the 2011 Agreement that would allow

---

[163] Clause 2.9 of Schedule A of the 2011 Terminalling Agreement.
[164] Clause 4.1(b) of Schedule A of the 2011 Terminalling Agreement.
[165] Def.'s Opening Br., at 15.
[166] *Id.* at 18.
[167] *Id.*

44

delivery to the Terminal by truck once certain modifications to the Terminal are made… but Delphi refused to enter into such an amendment."[168]

Magellan alternatively argues that if the Court determines that 2.1(a) of Schedule A of the 2011 Agreement affords Delphi the right to deliver product to the terminal by truck, Delphi has suffered no recoverable damages by Magellan's alleged failure to allow delivery by truck.[169] Magellan contends that Section 4.2 of Schedule A of the Terminalling Agreements limits damages and provides that "'[n]either party will be liable for other party's *lost profits, lost business opportunities*, or other indirect, special, incidental, punitive, or consequential damages in connection with this Agreement."'[170] Magellan contends that Delphi has identified "only two specific opportunities it claims it had to purchase product for delivery to the Terminal by truck."[171] Magellan asserts that "[r]egarding the first alleged lost opportunity, in January 2012, Delphi never bid to purchase the product in question, nor did Delphi offer the product for sale to another party."[172] Magellan also asserts, as to the second alleged lost opportunity, "Delphi purchased and immediately sold the product directly to a third party, without putting the product in storage."[173]

---

[168] *Id.*
[169] *Id.*
[170] *Id.* at 18-19 (quoting Clause 4.2 of Schedule A of 2005 and 2011 Agreements).
[171] *Id.*
[172] *Id.*
[173] *Id.* at 18.

Delphi argues that "the 2011 Agreement permits Delphi to deliver product to the Terminal by truck because the 2011 Agreement and extrinsic evidence shows[*sic*] that the parties agreed and intended that Delphi would have the truck delivery right."[174] Additionally, Delphi asserts that Magellan knew that Delphi required that the 2011 Agreement contain the right to deliver product to the Terminal by truck and that Magellan fraudulently induced Delphi into entering into the 2011 Agreement.[175] Delphi claims that "[s]ummary judgment on this claim should be denied since at minimum there is an issue as to what the parties intended as to the inclusion of the truck receipt language in the 2011 Agreement."[176]

Issues of contract interpretation are matters of law for the Court to decide.[177] When interpreting a contract, the Court gives priority to the parties' intentions as reflected within the four corners of the document.[178] "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[179] "Delaware law adheres to the objective theory of contracts, *i.e.,* a contract's construction should be that which would be understood by an objective, reasonable third party."[180]

---

[174] Pl.'s Answ. Br., at 20.

[175] *Id.* at 20-22.

[176] *Id.* at. 23.

[177] *Klair v. Reese*, 531 A.2d 219, 222 (Del. 1987).

[178] *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

[179] *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[180] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

Clear and unambiguous language will be given its "ordinary and usual meaning."[181] "When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity."[182] However,

> [a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Ambiguity does not exist where a court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.[183]

Although the Clause contains the word "deliveries," the remainder of the Clause contemplates only moving product away from the Terminal. Parsing out the language, it is apparent to the Court that "receipt of Product from the Terminal via truck" means that Delphi is receiving product at the Terminal in its trucks to be taken away from the Terminal. Additionally, it is equally as apparent to the Court that "delivery of Product from the Terminal via truck" means that Delphi is transporting the product that it loaded onto its trucks at the Terminal to another location not at the Terminal.

---

[181] *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008).
[182] *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014).
[183] *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195–96 (Del.1992).

Other provisions of the 2011 Agreement support the Court's interpretation of Clause 2.1(a). Clause 2.4 of Schedule A of the 2011 Agreement provides various Terminal operating guidelines. Clause 2.4 specifies the procedure for removing product from the Terminal by truck but does not provide an operating procedure for delivering product to the Terminal by truck.[184] Likewise, Clause 2.9 of Schedule A of the 2011 Agreement provides a procedure for loading product from specific tanks but does not provide a provision for delivering product to the tanks.[185] Additionally, Clause 4.1(b) of Schedule A of the 2011 Agreement contemplates limitations of liability for situations in which Delphi cannot load product onto trucks but does not provide for the same limitations if Delphi cannot deliver product by truck.[186] Therefore, in the context of the overall structure of the 2011 Agreement, Clause 2.1(a) is not susceptible to more than one meaning.

The Court finds that the contract, as written, objectively reflects that the parties' intention was for Delphi to only receive product from the Terminal via truck. Consequently, the Court will not consider the parties' negotiations or other

---

[184]*See* Clause 2.4 of Schedule of the 2011 Agreement ("*Customer may request the ability to load trucks with Heavy Oil at the Terminal…*").

[185] *See* Clause 2.9 of Schedule of the 2011 Agreement ("*Magellan will maintain two (2) positions for the loading of Heavy Oil from tanks 3,4,8,17 and 18…*").

[186] *See* Clause 4.1(b) of Schedule of the 2011 Agreement:

> If Customer is unable to load Heavy Oil at the Back [Truck] Rack…If Customer is unable to load Heavy Oil at a single (1) position of the Back [Truck] Rack…If Customer is unable to load Heavy Oil at the slower of the two truck loading positions at the Back [Truck] Rack…

extrinsic evidence. Moreover, unless Delphi can show that Magellan acted

fraudulently or in bad faith, Clause 4.2 of Schedule A of the 2005 and 2011

Agreements prevents Delphi from recovering consequential damages.[187]

Magellan's Motion for Partial Summary Judgment is **GRANTED**.

> 6. *It is Desirable to Further Develop the Factual Record Regarding Whether or Not Magellan Failed to Exercise Due Care as Alleged in ¶8(e) of the SAC.*

In ¶8(e) of the SAC, Delphi alleges that

> [o]n various dates, Magellan breached Clause 4.2 of Schedule A of the 2005 Agreement by failing to exercise reasonable care to safeguard Delphi's product in storage and/or in the gauging of the quantity of the receipts and deliveries of Delphi's product, resulting in the loss of more than 5,000 barrels of Delphi's produce in excess of the loss allowance provided Magellan in such Clause.

Section 4.2 of Schedule A of the 2005 Terminalling Agreement provides that

> Magellan will only be liable to Customer for damaged, lost, or destroyed Product to the extent that the damage, loss or destruction is caused by the failure of Magellan to use reasonable care in the storage and handling of the Product. Without limiting the foregoing, Magellan will only be liable for losses of Heavy Oil…in excess of 0.25% of the quantity of Heavy Oil…discharged at the Terminal in the Quarter in which the loss occurred…

In an email to another Magellan employee, Brett Hunter, Magellan's

representative, stated that "I don't believe that we've had one quarter since the start

---

[187] *See infra* Part V.C.

of the [2005] contract where we've had net gains in Delphi's tankage."[188]  In an

April 7, 2011 email to Delphi, Tony Bogle, a Magellan representative, stated, with

regard to process improvements made to reduce the overall product loss, that the

> process improvements/changes include:
>
> Install [*sic*] new gauge and float on flush oil tank
> Install new thermometer on flush oil tank
> Calibrate thermometer quarterly
> Reduce volume of over flush
> Mix the flush oil tank before and after a product move to obtain a
> uniform temperature.[189]

Magellan argues that the record is void of any factual support for the lack of

reasonable care alleged in by Delphi in ¶8(e) of the SAC.[190]  Magellan claims that

"[t]he 2005 Agreement provides that Magellan 'is not an insurer' of Delphi's

product, and is responsible only for losses in excess of 0.25%, and then **only if the**

**losses are caused by Magellan's failure to use due care**."[191]  Magellan contends

that there are no facts that show that Magellan "was negligent in the handling or

measurement of [Delphi's] product."[192]

Delphi argues that the factual record establishes that Magellan regularly lost

quantities of Delphi product in excess of the 0.25%.[193]  Delphi asserts that

Magellan acknowledged responsibility for the alleged excess losses while the

---

[188] Pl.'s Answ. Br., at Ex. 24.
[189] *Id.* at Ex. 27.
[190] Def.'s Opening Br., at 19.
[191] *Id.* (quoting Clause 4.2 of Schedule A of the 2005 Agreement).
[192] *Id.*
[193] Pl.'s Answ. Br., at 24.

product was in Magellan's custody and care.[194] Delphi contends that "when losses exceeded .25% ..., the excess was due to Magellan's lack of care in storing, gauging, and handling Delphi's product...Among the reasons for the product shortages were Magellan's failure to mix the tanks, failure to calibrate measurement equipment, and use of outdated gauges and floats in the tanks."[195] Delphi claims that Magellan failed to use due care when discovered various causes of product loss and applied remedial measures to its own tanks but did not apply the same measures to Delphi tanks until much later.[196]

The process improvements may be evidence to ultimately persuade a factfinder whether or not Magellan's behavior prior to the implemented improvements constituted lack of due care; however, the Court cannot find that the implementation of the improved process indicates, as a matter of law, that Magellan either exercised or failed to exercise due care in storing or handling Delphi's product. Moreover, what is "reasonable" behavior that constitutes "due care" is a highly factual determination. Therefore, the Court finds that "it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[197] Magellan's Motion for Partial Summary Judgment is **DENIED.**

---

[194] *Id.*
[195] *Id.* at 25.
[196] *Id.* at 25-26.
[197] *Cook*, 1990 WL 35244, at *3.

### B. Count II of the SAC for Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing is Limited.

Magellan argues to exclude specific allegations pertaining to Count II of the SAC because Magellan asserts that claims for breach of the implied covenant of good faith and fair dealing cannot be based upon conduct governed by an express contractual provision.[198] In Magellan's Opening Brief, Magellan created a chart[199] that identifies forty-nine specific allegations contained in either ¶8 of the SAC or in Delphi's responses to Magellan's Second Set of Interrogatories.[200] The first column is titled "Delphi's Allegations" and the second column is titled "Corresponding Express Contractual Provision." In the first column, Magellan identifies the various allegations raised by Delphi and in the second column, Magellan identifies by clause and/or section number the provision for which Magellan alleged expressly governed the allegation. Magellan argues that the identified allegations can be resolved by express contractual provisions of the 2005 and 2011 Agreements such that a claim for breach of contract and a claim for breach of the implied covenant of good faith and fair dealing cannot co-exist.[201]

Delphi acknowledges that claims based upon the implied covenant of good faith and fair dealing are not viable where the matter is expressly covered by

---

[198] Def.'s Open. Br., at 20.
[199] The Court will not replicate Magellan's chart which can be found in Def.'s Opening Br., 21-30.
[200] *Id.* at 21-30.
[201] *Id.* at 20-21.

contractual terms.[202] At oral argument, Delphi conceded that all but the following subsections of ¶8 of the SAC are governed by express contractual provisions: ¶¶8(c), (n), (q), (r), (u), (v) and (w).[203] However, Delphi asserts that "[w]here there is no 'specific language governing the implied obligation,' Delaware courts will permit claims for both express and implied breaches to move forward even when there is general contractual language covering the implied obligations."[204] Delphi contends that "it is the burden of the movant to cite a 'specific provision' in the agreement which governs the injuries allegedly suffered."[205] Delphi argues that Magellan has not identified specific contractual provisions that govern ¶¶8(c), (n), (q), (r), (u), (v) and (w) but merely relies upon general contractual provisions.[206]

---

[202] Pl.'s Answ. Br., at 27.

[203] *See* Tr. at 61:3-12:

> MR. MOONEY: And, specifically, we have identified the claims in 8(c) where Magellan used our product to flush their pumps, the claim in 8(n) where we allege that Magellan improperly contaminated our product, the claim in 8(q), which is another contamination claim, the claim in 8(u), which is overbilling for oil used to heat the tanks, (v) is overcharged for cleaning, and (w), which is that they forced Delphi on threat of a warehouseman's lien to send it $2 million in collateral.
>
> So those are the claims that we are citing to support the notion that the Court may not find that these -- specifically that Magellan's conduct specifically breached contractual terms that govern that kind of conduct, but that the conduct, nonetheless, breached its covenant of good faith and fair dealing.

[204] Pl.'s Answ. Br., at 27 (quoting *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, 2013 WL 5210255, at *7 (Del. Super. Sept. 4, 2013)).

[205] *Id.*

[206] *Id.* at 28.

At oral argument, counsel for Delphi acknowledged on the record that Delphi agrees with Magellan's representation of the law as to this matter.[207] "The 'implied covenant of good faith and fair dealing involves…inferring contractual terms to handle developments or contractual gaps that…neither party anticipated'"[208] or to "fill gaps in the contract's provisions."[209] The implied covenant of good faith and fair dealing cannot be invoked when the contract addresses the specific conduct at issue.[210] The burden is on the movant to cite a specific provision of the agreement which governs the allegation.[211]

Because Delphi acknowledges that only ¶¶8(c), (n), (q), (u), (v) and (w) of the SAC allege conduct to support claims for breach of the implied covenant of good faith and fair dealing, the Court's discussion is limited to whether Magellan has met its burden to cite a specific provision of the contract that governs those six subsections. The Court's findings are as follows:

- As to ¶8(c), regarding Magellan's alleged improper use of Delphi's
  product, and ¶8(v), regarding alleged inappropriate tank cleaning

---

[207] Tr. at 61:20-62:2 ("THE COURT: First of all, do you agree on the law? MR. MOONEY: I think we do.").

[208] *Nationwide Emerging Managers, LLC v. Northpointe Holding, LLC*, 112 A.3d 878, 896 (Del. 2015)(quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)).

[209] *Alltrista*, 2013 WL 5210255 at *7.

[210] *Nationwide, 112A.3d at 896.*

[211] *See Alltrista*, 2013 WL 5210255 at *7 ("[Defendant] cites no specific provision in the [contract] that [Defendant] alleges would govern the injury suffered by [Plaintiff].").

charges, of the SAC,[212] the Court finds that the express terms of the contract do not govern the conduct alleged. Therefore, Delphi is not precluded from pursuing a claim for breach of the implied covenant of good faith and fair dealing based upon the allegations contained therein.

- As to ¶¶8(n) and (q), relating to alleged instances of tank contamination, of the SAC,[213] the Court finds that Magellan did not address the conduct at issue in its submissions to the Court and, therefore, has not identified any express contractual provision that would preclude a claim for breach of the implied covenant of good faith and fair dealing.

---

[212] ¶ 8(c) provides that "Magellan improperly used Delphi's product during the term of the 2005 Agreement and during the term of the 2011 Agreement to flush the pumps at the heavy oil truck loading rack.
¶ 8(v) provides that "Magellan disguised and altered contractor invoices, which included inappropriate tank cleaning charges such as water washing, and then passed these inaccurate invoices to Delphi."

[213] ¶ 8(n) provides:

> Magellan contaminated Delphi's product in Tank 17 in September, 2011 when Magellan required Delphi to take back a portion of the product that Magellan had borrowed from Delphi, at a time when Delphi did not have a suitable tank available to accept such product, thereby causing contamination to the product already in the tank into which such product was placed. Delphi incurred costs for inspection, and mixing and transfer charges, and suffered the downgrade of the product used to cure the contamination.

¶ 8(q) provides: "On June 7, 2011, Magellan improperly transferred higher sulfur into a Delphi tank containing lower sulfur oil, thereby contaminating it. Magellan thereafter agreed to pay Delphi $16,957.82 for such contamination but has failed and refused to make payment."

- As to ¶8(u) of the SAC,[214] the Court finds that the express terms of the contract do not entirely control the allegation. The contract terms control to the extent that Magellan allegedly overbilled Delphi for heating costs. However, the contract does not govern to the extent of the alleged concealment of overbilling. Therefore, a claim for breach of the implied covenant of good faith and fair dealing may proceed with respect to the alleged concealment of overbilling.

- As to ¶8(w) of the SAC,[215] Second Amended Complaint, the Court finds that the express terms of the contract do not apply to the entire claim. The express provisions of the contract control whether the warehouseman's lien Magellan allegedly imposed is valid under the 2005 and 2011 Agreements; however, the express terms of the contract do not govern to the extent that Magellan allegedly failed to credit a known overbilling issue. Therefore, Delphi's claim for breach of the implied

---

[214] ¶ 8(u) provides that "Magellan overbilled Delphi by at least $580,000 between 2005-11 for the fuel consumed to heat Delphi's oil tanks, and then concealed its overcharges. Delphi confirmed Magellan's overbilling in December, 2014."

[215] ¶ 8(w) provides:

> Magellan forced Delphi to make $2,065,942.02 in collateral deposits in response to Magellan's threatened and actual imposition of an invalid warehouseman's lien on Delphi's product, which was not permitted under the 2005 or 2011 Agreements, exceeded any legitimate amount owed, and failed to credit Delphi with amounts Magellan knew it had overbilled Delphi.

covenant of good faith and fair dealing is limited to the alleged failure to credit a known overbill.

Therefore, Count II of the SAC for Breach of the Duty of Good Faith and Fair Dealing is limited by the aforementioned findings of fact and Magellan's Motion for Partial Summary Judgment is **GRANTED**, in part, and **DENIED**, in part.

### C. The Court Cannot Find that Clause 4.2 of Schedule A of the 2005 and 2011 Agreements is Enforceable as a Matter of Law or that it Applies to Claims Under Count II of the SAC.

Delphi and Magellan are sophisticated business entities.[216] The 2005 and 2011 Agreements govern the commercial relationship between Delphi and Magellan.[217] The 2005 and 2011 Agreements each contain provisions waiving the parties' rights to recover "lost profits, lost business opportunities, or other indirect, special, incidental, punitive, or consequential damages in connection with this Agreement."[218]

Magellan argues that the limitation of liability provision contained in Clause 4.2 of Schedule A of the 2005 and 2011 Agreements is enforceable under Delaware law.[219] Magellan urges the Court to "rule as a matter of law that Delphi is not entitled to recover 'lost profits, lost business opportunities, or other indirect,

---

[216] SAC at ¶¶ 1-2.
[217] *See generally,* SAC at Ex. A; Ex. B.
[218] Clause 4.2 of Schedule A of the 2005 and 2011 Agreements.
[219] Def.'s Opening Br., at 31.

special, incidental, punitive, or consequential damages in connection with [the Agreements].'"[220] Additionally, Magellan asserts that, to the extent that the Court denies its Motion and allows Delphi to pursue claims for breach of the implied covenant of good faith and fair dealing, damages related to those claims also are limited by the terms of Clause 4.2 of Schedule A of the 2005 and 2011 Agreements because the parties did not carve out an exception for instances of bad faith.[221] Magellan does not argue that Clause 4.2 of Schedule A of the 2005 and 2011 Agreements is enforceable as to any of Delphi's fraud claims that survive Magellan's Motion to Dismiss.[222]

Delphi argues that Clause 4.2 of Schedule A of the 2005 and 2011 Agreements is not fully enforceable because Delphi has pleaded instances of fraud that are outside of the contract.[223] Delphi also asserts that the Court recognizes an exception to the rule that limitations of liability clauses are generally enforceable.[224] Delphi contends that the Court will set aside limitations of liability clauses for fraudulent or bad faith breaches of contract.[225] Delphi also asserts that the limitation of damages clause is unconscionable because "[b]y intentionally breaching the Agreements with the intent of relying on the limitation provision to

---

[220] *Id.* (quoting Clause 4.2 of Schedule A of 2005 and 2011 Agreements).
[221] *Id.*
[222] Def.'s Reply Br., D.I. 182, at 15.
[223] Pl.'s Answ. Br., at 30.
[224] *Id.* at 32-33.
[225] *Id.*

58

escape accountability for its misconduct, Magellan has unfairly taken advantage of Delphi."[226] Finally, Delphi asserts that it is entitled to rescission or disgorgement because "Magellan's breach of the 2011 Agreement by refusing to permit Delphi to deliver product to the terminal by truck substantially frustrated Delphi's principal purpose in making the agreement – use of the terminal to store its product."[227]

In its Answering Brief, Delphi requested the equitable remedies of disgorgement and rescission for the first time in this litigation. The Court finds the request inappropriate. Additionally, even it were a proper request, the Court found that Clause 2.1(a) of Schedule A of the 2011 Agreement did not give Delphi the right to deliver product to the Terminal via truck.[228] Therefore, the Court cannot find that Magellan's alleged actions to refuse delivery of product to the Terminal via truck substantially frustrated Delphi's principal purpose in making the 2011 Agreement.

There is no dispute that damages recovered under Counts IV and V of the SAC are not limited by Clause 4.2 of Schedule A of the 2005 and 2011 Agreements because the Counts allege fraudulent conduct.[229] However, the issue is whether the Court carves out a "bad faith" exception to the damages limitation

---

[226] *Id.* at 33-34.

[227] *Id.* at 34.

[228] *See supra* Part V.A.5.

[229] Had the Court not dismissed Count III of the SAC in §V.A.2, *supra*, the limitation of liability clause would not be enforceable as to that Count.

clause as it pertains to the contractual claims in Count I of the SAC and the implied

covenant of good faith and fair dealing claims in Count II of the SAC.

Generally, limitation of liability clauses that preclude consequential damages

are enforceable under Delaware law.[230] The Delaware Court of Chancery explains

that

> Delaware upholds the freedom of contract and enforces
> as a matter of fundamental public policy the voluntary
> agreements of sophisticated parties. Delaware law
> generally elevates contract law over tort to allow parties
> to order their affairs and bargain for specific results, to
> the point where Delaware law enforces contractual
> provisions that eliminate the possibility of any tort
> liability short of actual fraud based on explicit written
> contractual representations.[231]

Recently, in *eCommerce Indus., Inc. v. MWA Intelligence, Inc*., 2013 WL 5621678,

that Court of Chancery held that even a bad faith breach of contract would not

invalidate a limitation of liability provision.[232] The *eCommerce* court determined

that "there does not appear to be any Delaware precedent for striking a limitation

on contractual liability because of a party's willful or bad faith breach of the

contract."[233] The court reasoned that

> a limitation on liability will be set aside due to willful
> misconduct or bad faith involved contractual provisions
> that purported to limit *tort* liability, which is liability

---

[230] *eCommerce Indus., Inc. v. MWA Intelligence, Inc*., 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013).

[231] *NACCO Indus., Inc. v. Applica Inc*., 997 A.2d 1, 35 (Del. Ch. 2009).

[232] *eCommerce*, 2013 WL 5621678, at *45.

[233] *Id.*

arising from breach of a duty that does not arise under contract…Had the parties desired to carve out an exception to the [contract's] limitation of liability provision for instances of bad faith or willful breach, they could have done so, but they did not.[234]

The case law from the Superior Court carves out an exception for bad faith breaches of contract in specific instances.[235] For example, in *J.A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, in the context of interpreting a construction contract provision that did not specifically carve out an exception for bad faith, the Court observed that "[e]ven if a contract purports to give a general exoneration from 'damages,' it will not protect a party from a claim involving its own fraud or bad faith."[236]

In *Data Mgmt. Internationale, Inc. v. Saraga*, 2007 WL 2142848, the Court recognized an exception for conversion, an intentional tort.[237] In that case, the Court commented that "[clauses purporting to exonerate a party from liability for its own negligence] can be enforced in commercial leases negotiated in an arm's-length transaction, but the parties' intent to provide immunity from even simple negligence must be stated clearly and unequivocally in order to be enforceable."[238] The corollary to that seems to be that where the intent to exonerate a party from

---

[234] *Id.*
[235] *Id.*
[236] *J.A. Jones Const. Co v. City of Dover*, 372 A.2d 540, 545 (Del. Super. 1977). J.A. Jones, 372 A.2d at 545.
[237] *Id.*
[238] *Id.*

liability for its own negligence is not clearly and unequivocally stated, there is no immunity for that party's negligence. However, "[i]t has been repeatedly recognized that the issue of whether limitation provisions are enforceable under the contractual relations of the parties and the nature of the contractual performance are matters which generally should not be decided on the pleadings or on summary judgment."[239]

It appears to the Court that the law required to resolve this issue is not absolute and that there seems to be a spectrum of behavior for which the Court may invalidate limitations of damages clauses depending upon the particular facts of the parties' conduct. It is undisputed that parties cannot absolve themselves for their own conduct amounting to fraud. However, as to claims that fall somewhere short of fraud, such as claims for bad faith, the Court must undergo a factual analysis that is premature on summary judgment. Therefore, the Court cannot rule as a matter of law that the limitations of damages clause is enforceable and that it applies to claims for breach of the implied covenant of good faith and fair dealing. Magellan's Motion for Partial Summary Judgment is **DENIED** as to the limitation of damages provision.

---

[239] *Id.* at 553.

## VI. DELPHI'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In Delphi's Motion for Partial Summary Judgment, Delphi requests that the Court address five issues. Delphi asserts that there are no genuine issues of material fact and that Delphi is entitled to judgment as a matter of law on the following claims: 1) Magellan owes Delphi $421,603.06 for overbilling of heating charges under the 2005 Agreement; 2) Delphi has no responsibility to Magellan for heating charges under the 2011 Agreement; 3) Magellan breached the 2011 Agreement by denying Delphi the right to deliver product to the terminal by truck; 4) Delphi's responsibility for tank cleaning is limited to removing product and waste that can be removed by shovel and broom; and 5) Magellan's Amended Counterclaim.

### A. Facts Regarding Magellan's Alleged "Overbill" are not Well Developed.

In light of the Court's decision to dismiss Delphi's Count III for fraudulent overbilling, what remains is Delphi's contract claim regarding the alleged overbilling. Delphi moves for summary judgment on its contract claim that Magellan overbilled Delphi $421,603.06 in tank heating charges from 2007 through 2010 under the 2005 Agreement and requests leave to supplement the amount plus interest based upon a chart prepared by Magellan employees.[240] Delphi argues that the chart establishes that Magellan overbilled Delphi for heating

---

[240] Pl.'s Opening Br., at 5.

costs between 2007 and 2010.[241] Delphi claims that deposition testimony of Magellan employees establishes that the chart was prepared in the ordinary course of business by a Magellan employee and asserts that there are no facts to undermine the accuracy of the chart.[242] Delphi contends that the chart and deposition testimony together establish that Delphi suffered damages in the amount of $421,603.03 from 2007 through 2010 as a result of Magellan's overbilling for heating costs.[243] In its Reply Brief, Delphi asserts that the statute of limitations is tolled because the conditions were inherently unknowable and Delphi is blamelessly ignorant or, alternatively, that Magellan concealed the overbilling.[244]

Magellan argues that the chart does not conclusively establish that Magellan overbilled Delphi for heating costs from 2007 through 2010.[245] Magellan asserts that, at most, the chart shows that "meters and hand gauging generated different measurements, not that one was better or correct, or even that the two were measuring the same thing at the same time."[246] Magellan contends that Magellan should be permitted to introduce evidence at trial as to "what product was consumed, and what impact (if any) any discrepancy in measurement actually had

---

[241] *Id.*
[242] Pl.'s Reply Br., D.I. 185, at 4.
[243] Pl.'s Opening Br., at 5.
[244] Pl.'s Reply Br., at 6.
[245] Def.'s Resp. Br., D.I. 171, at 4.
[246] *Id.* at 3.

on customer billing."[247] Additionally, Magellan asserts that the parties agreed to tolling agreements for claims that arose between September 2011 and the filing of the lawsuit but that the statute of limitations bars earlier claims to recover heating bills that were issued and paid before September 2008 based upon the three-year statute of limitations for breach of contract claims under Delaware law.[248]

For economy, the Court will not repeat the previously stated law regarding breach of contract claims and the statute of limitation that can be found at §V.A, *supra*. The question for the Court is whether the chart and deposition testimony relied upon by Delphi are undisputed material facts that support each element of a claim for breach of contract. Because neither party disputes that a valid contract exists, the inquiry for the Court is focused on whether the chart and deposition testimony support the elements of breach and damages. As a preliminary matter, the Court agrees with Magellan that Delphi's prayer for relief is limited to $421,603.06 for purposes of this Motion.[249]

The chart was prepared by Stu Horsey, a deceased Magellan employee.[250] In the first column, the chart lists "Heat Charges by Meter" and in the second column, the chart lists "Heat Charges by Tank Gauge."[251] The third column is

---

[247] *Id.* at 4.
[248] *Id.* at 5.
[249] *See* Tr. at 94: 12-18 (arguing that at most, Delphi can ask the Court to award it the specific amount in the chart on summary judgment).
[250] Hafner Dep., at 35:6-7.
[251] Pl.'s Opening Br. at Ex. D.

titled "Overbill."[252] When asked during a deposition "What does overbill mean here?" Paul Hafner, a Magellan representative, testified "I'm assuming it's the difference between the two numbers, charges between…the meters and tank gauges."[253] Additionally, Paul Hafner testified that the tank gauge was a more reliable measure and that it was his understanding that customers, including Delphi, were billed based upon the higher meter reading.[254]

However, the Court still has concerns regarding the content of the chart and its meaning. The label "Overbill" is one employee's characterization of the difference between the amounts contained in the first two columns. Because the chart itself and the individual who created the chart cannot be cross-examined, the Court is wary of accepting this employee's conclusion as an undisputed fact. Rather, the Court finds "that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[255]

Moreover, the Court finds that the claim may be barred by the statute of limitations. The chart covers years 2007 through 2010. Ordinarily, breach of contract claims must be raised within three years of the injury and Delphi did not sue Magellan until February 29, 2012. However, Delphi contends that "Magellan never notified Delphi of the overbilling and Delphi first discovered it when

---

[252] *Id.*
[253] Hafner Dep., at 37:21-24.
[254] *Id.* at 36:20-24; 38:1-3.
[255] *Cook,* 1990 WL 35244, at *3.

66

reviewing Magellan's 35,000 page 2014 document production."[256]  Delphi asserts

that the conditions of the alleged overbilling were "inherently unknowable" and

Delphi is "blamelessly ignorant" or, alternatively, that Magellan concealed the

overbilling such that Delphi could not know about it.[257]   There are no facts which

inform the Court about when Delphi discovered or was on notice of the alleged

overbilling other than a claim in Delphi's Reply Brief that "Delphi did not discover

Magellan's overbilling practice until it found Magellan's spreadsheet and

correspondence detailing these overcharges among the 35,000 documents

Magellan produced in March 2014"[258] without reference to the record.

Consequently, the record is unclear regarding when the statute of limitations began

to run.

Based upon the Court's desire to inquire more into the factual information

contained in the chart as well as the factual information regarding commencement

of the statute of limitations, the Court cannot find that Delphi has presented

undisputed facts to support the elements of its breach of contract claim.  Therefore,

Delphi's Motion for Partial Summary Judgment is **DENIED**.

> **B.     The Court Cannot Determine, As a Matter of Law, that Delphi has No Liability or Heating Charges Under the 2011 Agreement.**

Clause 2.10(e) of Schedule A of the 2011 Agreement provides that

---

[256] Pl.'s Opening Br., at 5.
[257] Pl.'s Reply Br., at 6.
[258] *Id.*

67

Magellan will only use the heaters that exist on the Effective Date, or the replacements thereof during the Term of the Agreement, to heat the Tankage unless Customer agrees otherwise in writing.

Tankage is defined as "the tankage allocated to Customer in Section V of this Agreement."[259] Section V of the 2011 Agreement refers to six specific tanks allocated to Delphi, the tank capacities and the type of product the tanks contain.[260]

Magellan admitted that it used the same heaters to heat Delphi's tank as it used to heat Magellan's other customers' tanks.[261] Ronald Gumbaz, a Delphi representative, admitted in deposition testimony[262] that Delphi has some responsibility for heating costs under the 2011 Agreement.[263]

Delphi argues that Magellan breached Clause 2.10(e) of Schedule A and Schedule C of the 2011 Agreement regarding heating charges.[264] Delphi asserts that Clause 2.10(e) of Schedule A and Schedule C of the 2011 Agreement provides

---

[259] Clause 1.16 of Schedule A of the 2011 Agreement.
[260] Section V of the 2011 Agreement.
[261] Def.'s Answ. to SAC, D.I. 174, at ¶8(b).
[262] Relevant excerpts from Ronald Gumbaz's deposition can be found in Def.'s Resp., at Ex. 3.
[263] *See* Gumbaz Dep., at 35:13-23:

> [Ronald Gumbaz]: [Delphi] do[es]n't want any liability for the heating bills that Magellan has sent us under the 2011 agreement.
>
> BY MS. DAILEY: Q. You don't think [Delphi] should pay for heating at all [under the 2011 Agreement]?
>
> A. I think [Delphi] should pay something for heating. I think that if somebody would calculate accurately how much it cost[*sic*] to heat [Delphi] tanks in accordance with [Delphi's] instructions, that it would be a cost that [Delphi] should pay.

[264] Pl.'s Opening Br., at 10-11.

68

that Magellan was to use certain heaters to heat six Delphi tanks only (and not other customers' tanks) to ensure that the heating charges for Delphi would be accurate.[265] Delphi asserts that because Magellan used the specified heaters to heat other customers' tanks, Magellan's heating charges to Delphi are "completely unsupportable" because there was no way to allocate the heating costs accurately between Delphi and the other customers.[266] Delphi requests that the Court enter an Order declaring that "[Delphi] has no liability for heating charges assessed by Magellan under the 2001 Agreement."[267]

Magellan argues that Clause 2.10(e) of Schedule A of the 2011 Agreement does not give Delphi the exclusive right to use the heaters for only Delphi tanks.[268] Magellan argues that the Clause "constitutes Magellan's agreement to use only the then-existing heaters (or their same model replacements) to heat Delphi's product, unless Delphi agrees a different heater can be used. This is not a limitation on Magellan's right to use those heaters for other customers' products."[269] Magellan asserts that Delphi representatives admitted in deposition testimony that Delphi

---

[265] *Id.*
[266] *Id.* at 11.
[267] Pl.'s Opening Br., at 12.
[268] Def.'s Resp. Br., at 6.
[269] *Id.*

"should pay something for heating."[270] At oral argument, Magellan asserted that that admission alone defeats Delphi's prayer for relief. [271]

Based upon Delphi's prayer for relief, the question before the Court is a narrow one: Do the undisputed facts establish that Delphi "has no liability for heating charges assessed by Magellan under the 2011 Agreement?" The Court need not decide the meaning of Clause 2.10(e) of Schedule A of the 2011 Agreement to resolve that question because Ronald Gumbaz, a Delphi representative, admitted in deposition testimony that Delphi has some responsibility for heating costs under the 2011 Agreement.[272] Therefore, the Court cannot rule as a matter of law that Delphi has no responsibility to pay for heating charges under the 2011 Agreement and Delphi's Motion for Partial Summary Judgment is **DENIED**.

C. **The Court Previously Determined that Clause 2.1(a) of Schedule A of the 2011 Agreement Does Not Give Delphi the Right to Deliver Product to the Terminal by Truck.**

In light of the Court's decision that Clause 2.1(a) of the Schedule A of the 2011 Agreement does not give Delphi the right to delivery product to the Terminal by truck,[273] Delphi's Motion for Partial Summary Judgment is **DENIED**.

---

[270] *Id.* at 8.
[271] *See* Tr. at 102: 4-6 ("Delphi's own representative's testimony is at odds with the summary judgment relief it seeks").
[272] *See supra* note 263.
[273] *See supra* Part V.A.5.

**D.    Delphi's Prayer for Relief is Improper Regarding Clause 2.8 of Schedule A of the 2011 Agreement.**

Under the heading "Tank Condition," Clause 2.8 of Schedule A of the 2005 and 2011 Agreements provides, part, that: "At [Delphi's] expense, Magellan will remove the remaining Product and waste from the tank that can be removed by shovel and broom…"

In Delphi's Opening Brief, Delphi's prayer for relief states that Delphi

> seeks a ruling that Delphi is not responsible for the entire cleaning of the tank and that Clause 2.8 means what it clearly states: that Delphi pays the cost of removing the remaining product and waste that can be removed by shovel and broom.  Magellan would be responsible for any additional tank cleaning it desired, including water washing.[274]

Counsel for Delphi acknowledged at oral argument that Clause 2.8 is a point of heated dispute between the parties:

> THE COURT: …What are you asking with respect to the tank cleaning?  Are you asking for summary judgment, or are you just asking for declaratory judgment?

> MR. MOONEY: Well, a declaration that the language of 2.8 means that Delphi is responsible for removing product and waste such as can be removed by shovel and broom because *that's a point of heated dispute*.[275]

Delphi argues that it is entitled to summary judgment regarding the extent of its liability for tank cleaning charges.  Delphi contends that "Magellan has taken

---

[274] *Id.*

[275] Tr. at 92: 4-12 (emphasis added).

71

the unsupportable position that Delphi is responsible for all costs of removing product and waste from the tanks, which is at odds with the plain language of Clause 2.8."[276] Delphi asserts that it is only responsible for what can be removed by "shovel and broom."[277]

Magellan argues that the issue is not appropriate for summary judgment because there is more than one clause which governs tank cleaning responsibilities and reading one clause in isolation ignores the rest of the Agreement.[278] Magellan contends that the meaning of the language contained in Clause 2.8 is a "deeply factually-intensive dispute."[279] Additionally, Magellan asserts that Delphi's prayer for relief "is not a product of undisputed facts. There are no facts to support [Delphi's] request [for relief]."[280]

The Court finds that Delphi's prayer for relief requesting that the Court determine that "Clause 2.8 means what it clearly states" is undermined by Counsel's admission at oral argument that the issue is a "point of heated dispute." Therefore, the Court cannot grant the relief Delphi requests. Delphi's Motion for Partial Summary Judgment is **DENIED**.

---

[276] Pl.'s Opening Br., at 16.
[277] *Id.*
[278] Def.'s Resp. Br., at 14.
[279] Tr. at 108: 5-6.
[280] Tr. at 105: 14-106:3.

**E.      The Parties Agree that Magellan has Identified the Basis for its Amended Counterclaim.**

On February 16, 2015, Magellan filed an Answer to Plaintiff's Second Amended Complaint and Affirmative Defenses.[281] The Answer contained Magellan's Amended Contingent Counterclaim that requested payment of certain invoices and alleged, in part, that

> 6. Delphi wired payment to Magellan and then, after the funds were received by Magellan, claimed the payments were made under protest. Delphi also has attempted to characterize the payment as "collateral" and has sought to recover the payment made.
>
> 7. If Delphi's payment is determined by the Court to be unconditional (as Magellan believes it should be), then no amount is currently due from Delphi. However, if Delphi's payment is determined to be merely "collateral" or "contingent" then Delphi has breached the parties' Agreements in the amount not unconditionally paid.[282]

Delphi moves for summary judgment on Magellan's Amended Counterclaim for failure to make payments because Delphi asserts that Magellan has not identified the factual basis to support the Amended Counterclaim.[283] Delphi asserts that the Amended Counterclaim "does not specify the amount allegedly owed by Delphi and does not attach any alleged unpaid invoices."[284] Delphi contends that it "will be unfairly prejudiced if Magellan is permitted to submit its

---

[281] D.I. 174.
[282] *Id.* at ¶¶6-7.
[283] Pl.'s Opening Br., at 17.
[284] *Id.*

73

unsupported and conclusory allegations of non-payment at trial since Magellan has refused to provide information that would enable Delphi to verify Magellan's contentions."[285]

Magellan claims that it provided Delphi with sufficient factual information to support its Amended Counterclaim. Magellan asserts that "Magellan produced all invoices that are the subject of Magellan's counterclaim. Magellan also produced Brett Hunter as a corporate representative for deposition, and he testified extensively to the unpaid invoices that form the basis of Magellan's counterclaim."[286]

At oral argument, Magellan identified on the record the invoices that are at issue for purposes of the Amended Counterclaim.[287] Delphi acknowledged on the record that the identification of the invoices by Magellan was sufficient to clarify the factual basis of Magellan's Amended Counterclaim.[288] Therefore, Delphi's Motion for Partial Summary Judgment is **MOOT**.

---

[285] *Id.* at 19.

[286] Def.'s Resp. Br., at 17.

[287] Tr. at 111: 4-5 ("MR. KEGLOVITS: All of [the unpaid invoices discussed at the first deposition] if it is collateral. None of [the unpaid invoices discussed at the first deposition] if it is a payment.").

[288] *See* Tr. at 112: 17-113: 1:

> THE COURT: …for the limited purpose of what is before the Court now on a partial motion for summary judgment, on that contingent counterclaim, you know what you are talking about now and that goes away; am I right?
>
> MR. MOONEY: I think so, Your Honor.

74

## VII. CONCLUSION

Regarding Magellan's Motion to Dismiss, the Court finds that 1) Delphi failed to state a claim for which relief can be granted as to Count III of the SAC; 2) it is premature to determine whether the statute of limitations precludes recovery under Count IV of the SAC; and 3) Delphi has adequately pleaded a cause of action under Count V of the SAC. Therefore, Magellan's Motion to Dismiss is **GRANTED** as to Count III of the SAC; **DENIED** as to Count IV of the SAC; and **DENIED** as to Count V of the SAC.

As to Magellan's Motion for Partial Summary Judgment, the Court finds that 1) no reasonable trier of fact could find that a breach of contract occurred based upon Magellan's conduct alleged in ¶8(k),(d),(o) and (a) of the SAC and that factual issues remained as to ¶8(p) and (e) of the SAC; 2) Count II of the SAC for breach of the implied covenant of good faith and fair dealing is limited; and 3) the Court cannot find that Delphi is not entitled to consequential damages as a matter of law. Therefore, Magellan's Motion for Partial Summary Judgment is **GRANTED** as to ¶8(k),(d),(o) and (a) of the SAC; **DENIED** as to ¶8(p) and (e); **GRANTED**, in part, and **DENIED**, in part, as to Count II of the SAC; and

---

THE COURT: As a summary judgment claim.

MR. MOONEY: As a summary judgment claim.

75

**DENIED** as to the enforceability of Clause 4.2 of Schedule A of the 2005 and 2011 Agreements.

Regarding Delphi's Motion for Partial Summary Judgment, the Court finds that 1) there is a factual dispute regarding whether Magellan owes Delphi $421,603.06 for overbilling of heating charges under the 2005 Agreement; 2) the Court cannot rule as a matter of law that Delphi has no responsibility to Magellan for heating charges under the 2011 Agreement; 3) Magellan did not breach the 2011 Agreement by denying Delphi the right to deliver product to the terminal by truck; 4) the Court cannot grant the relief Delphi requested regarding responsibility for tank cleaning based upon its prayer; and 5) Magellan identified the factual basis of its Amended Counterclaim. Therefore, Delphi's Motion for Partial Summary Judgment is **MOOT** as to Magellan's Amended Counterclaim; and **DENIED** as to the remainder of Delphi's arguments.

**IT IS SO ORDERED.**

_____
**/s/**Ferris W. Wharton, Judge